PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| HOPE CHRISTIAN FELLOWSHIP, *et al.*, | ) | |
| | ) | CASE NO. 4:15CV02275 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| CHESAPEAKE ENERGY CORPORATION, *et al.*, | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendants. | ) | **ORDER** [Resolving ECF No. 15] |

Pending is the Motion to Compel Individual Arbitration and Motion to Stay, ECF No. 15, filed by Defendants Chesapeake Energy Corporation ("Chesapeake Energy") and Chesapeake Operating, L.L.C. ("Chesapeake Operating") (collectively "Defendants"). Plaintiffs ("Royalty Owners") filed an Opposition, ECF Nos. 17. Defendants filed a Reply, ECF No. 20. For the reasons that follow, the motion to compel individual arbitration is granted, and the motion to stay is granted.

## I. Background

As Defendants state, "This case is part of a web of class actions filed in multiple tribunals—on behalf of overlapping groups of [the] same plaintiffs—all by the same Plaintiffs' counsel and all based on the same basic premise that Chesapeake entities allegedly underpaid

royalties due under oil and gas leases."[1] Brief in Support, ECF No. 15-1 at PageID #: 167. Royalty Owners entered into oil and gas leases ("Leases") with non-party Chesapeake Exploration, L.L.C. ("Chesapeake Exploration"), leasing their oil and gas rights to real property located in Ohio. *See* Amended Class Action Complaint, ECF No. 5 ¶ 1. Defendants are affiliates of signatory Chesapeake Exploration, but are not themselves signatories to the Leases. *See* Brief in Support, ECF No. 15-1 at PageID #: 170–71. Chesapeake Exploration produces the gas, while Defendants "hold the proceeds of the sale of the gas, calculate the royalties [, and] issue the royalty checks."[2] Amended Class Action Complaint, ECF No. 5 ¶¶ 6–7. In this putative class action, the Royalty Owners assert that Defendants' allegedly fraudulent underpayment of oil and gas royalties amounted to conversion, and violation of the Ohio Corrupt Practices Act, R.C. § 2923.31, *et seq.* ("Ohio RICO Act"). *See* Amended Class Action Complaint, ECF No. 5 ¶ 8–16.

Defendants filed the motions now under review, ECF No. 15, asking the Court to compel individual arbitration as to the Royalty Owners whose Leases contain an arbitration provision, and to stay the case as to the remaining Royalty Owners.[3]

---

[1] This action is related to two other actions that were filed in this Court: *Chesapeake Exploration, L.L.C. v. Henceroth, et al.*, Case No. 4:16CV00150 (N.D. Ohio) ; *Henceroth, et al. v. Chesapeake Exploration, LLC*, Case No. 4:15CV02591 (N.D. Ohio).

[2] Some of the Royalty Owners have not yet received royalty checks. *See* Amended Class Action Complaint, ECF No. 5 ¶¶ 2–3.

[3] Only ten (10) of the forty (40) named Royalty Owners have a Lease that does not contain an arbitration provision. *See* Brief in Support, ECF No. 15-1 at PageID #: 168.

## II. Motion to Compel Individual Arbitration

The Royalty Owners disagree with Defendants' contention that their claims must be submitted to arbitration pursuant to the Leases. *See generally* Opposition, ECF No. 17. "Before compelling an unwilling party to arbitration . . . the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 195 (6th Cir. 2016) (quoting *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003)).

### A. Valid Agreements to Arbitrate

The following are the four types of arbitration provisions that appear in the Leases:

• ARBITRATION. In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

• **NOTICES AND ARBITRATION** In the event either party considers that the other has not complied with any of its obligations hereunder, either express or implied, said party shall notify the other in writing setting out specifically in what respects the contract has been breached. The party served with such notice shall then have thirty (30) days after receipt of notice within which to meet or commence to meet all or any part of the breaches alleged. The service of said notice shall be mandatory prior to the bringing of any claim under this lease of any cause, and no such action shall be brought until the lapse of thirty (30) days after the service of such notice. Any controversy or claim arising out of or relating to this agreement shall be settled by arbitration. Either party may initiate any arbitration proceeding by notifying the other party in writing, but only after the aforementioned notice of breach [h]as been served and the time period for cure provided for in this lease has expired. The procedure to be followed in the event

(4:15CV02275)

of any arbitration shall be that prescribed in the Rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrators may be entered in any Court having jurisdiction thereof.

• **Arbitration:** Any controversy or claim arising out of or relating to this Lease or performance hereunder shall be ascertained and determined by three (3) disinterested arbitrators, one thereof to be appointed by Lessor, one by the Lessee, and the third by the two (2) so appointed as aforesaid, and the award of such collective group shall be final and conclusive. Arbitration proceedings hereunder shall be conducted at the county seat of the county where the Lease or action occurred which is cause for the arbitration, or such other place as the parties to such arbitration shall all be mutually agreed upon. Each party shall pay its own arbitrator and the costs of the third arbitrator shall be borne equally. Either party may, without waiving any remedy under this agreement seek from any court having jurisdiction ar rights or property of that party, pending the establishment of the arbitral tribunal (or Pending the arbitral tribunal's determination of the merits of the controversy or claim).

• **Arbitration**

Any questions concerning the Lease or performance thereunder shall be ascertained and determined by three disinterested arbitrators, one thereof to be appointed by the Lessor, one by the Lessee and the third by the two so appointed, and the majority vote award of such collective group shall be final and conclusive. In the event that the two appointees of Lessor and Lessee cannot agree upon the third, the parties shall thereupon submit to the rules and procedures of the American Arbitration Association. Arbitration proceedings shall be conducted at the county seat of the county where the leased property is located or such other place as the parties to such arbitration shall all mutually agree. Each party shall pay its own arbitrator and the costs of the third arbitrator (umpire) shall be borne equally. The determination rendered by the arbitrators may be entered in the court of general jurisdiction in the county where the Leased Premises is located.

Either party may apply to the arbitrators seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy under this agreement, seek from the court of general jurisdiction in the county where the Leased Premises is located any interim or provisional relief that is necessary to protect the rights of property of that party, pending the establishment of the arbitration tribunal and its decision.

The arbitrators shall consider dispute issues in accordance with and subject to the terms of the Lease.

Brief in Support, ECF No. 15-1 at PageID #: 172-73; *see* Motion Exs. C–F.

The validity of the arbitration provisions is not in dispute. Rather, it is their scope (*i.e.*, applicability) that is central to the parties' disagreement.

**B. Scope of Arbitration Provisions**

The Sixth Circuit has held that in determining the scope of an arbitration clause, a court must "ask if an action could be maintained without reference to the contract or relationship at issue." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003). The Royalty Owners do not assert (and the Court does not find persuasive) an argument that the substance of the claims would fall outside the scope of their arbitration provisions even if brought against signatory Chesapeake Exploration. The broad provisions cover disputes arising from performance and obligations under the Leases. *See* Brief in Support, ECF No. 15-1 at PageID #: 172-73; Motion Exs. C–F. Surely, if asserted against their contractual counter-party, the Royalty Owners' claims for fraudulent underpayment of the royalties owed under the Leases would be within the ambit of the arbitration provisions. *See, e.g., Turi v. Main Street Adoption Services, LLP*, 633 F.3d 496, 511 ("The plaintiffs' fee claims here—for unjust enrichment and for conversion—are clearly covered by the arbitration clause "regarding fees" and therefore must be resolved by arbitration."). Instead, the linchpin of the Royalty Owners' arguments is that "the [arbitration] provisions are either (1) expressly limited to disputes between the parties [to the Leases] or (2) include no mechanism for the selection of arbitrators except in disputes between the parties." Opposition, ECF No. 17 at PageID #: 354. Relatedly, they argue that, in general, a non-party cannot enforce a contractual agreement to arbitrate. *Id.* at PageID #: 352.

(4:15CV02275)

**(i) Non-party Enforcement of Arbitration Provisions**

"State law governs the question of whether a nonparty can enforce an arbitration clause against a party." *Thomas v. Right Choice Staffing Group, LLC*, No. 15–10055, 2015 WL 4078173, at *6 (E.D. Mich. July 6, 2015) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631, 129 S.Ct. 1896, 173 L.Ed.3d 832 (2009)). There is no dispute that Ohio law is the applicable state law on this issue. Ohio courts adopt a presumption in favor of arbitration. *See Rivera v. Rent A Center, Inc.*, No. 101959, 2015 -Ohio- 3765, 2015 WL 5455882, at *2 ¶ 11 (Ohio Ct. App. Sept. 17, 2015). Moreover, "Ohio courts have recognized that a nonsignatory agent may enforce an arbitration agreement between a plaintiff and the agent's principal when ordinary principles of contract and agency law require." *Id.* at *4 ¶ 20.

According to the Ohio Court of Appeals,

> Ohio courts have also recognized an "alternate estoppel theory" whereby "arbitration may be compelled by a nonsignatory against a signatory due to the 'close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract * * * and [the fact that] the claims were "intimately founded in and intertwined with the underlying contract obligations."''" Under this theory, because the individual defendants' allegedly wrongful acts related to their actions as agents of the company that was a party to the arbitration agreement, the nonsignatory agents should also have the benefit of the arbitration agreement made by their principal.

*Short v. Resource Title Agency, Inc.*, No. 95839, 2011 -Ohio- 1577, 2011 WL 1203906, at *3 ¶ 15 (Ohio Ct. App. March 31, 2011) (citations omitted).[4]

---

[4] This Sixth Circuit has recognized this principle. *See, e.g.*, *Bowie v. Clear Your Debt, LLC*, 523 F. App'x 315, 317 (2013) ("[N]onsignatories cannot ordinarily compel arbitration. But where there is an agency relationship between a signatory and a nonsignatory, the nonsignatory may compel arbitration. *Javitch v. First Union Securities*,
(continued...)

Unquestionably, signatory Chesapeake Exploration and non-signatory Defendants are closely affiliated entities. *See* Brief in Support, ECF No. 15-1 at PageID #: 175 (Defendant Chesapeake Energy is the parent corporation of signatory Chesapeake Exploration and Defendant Chesapeake Operating.); Corporate Disclosure Statement in *Chesapeake Exploration, L.L.C., v. Henceroth, et al.*, Case No. 4:16CV00150, ECF No. 2 at PageID #: 145 (Defendant Chesapeake Operating is one of three L.L.C. members of signatory Chesapeake Exploration, and Defendant Chesapeake Energy is the sole L.L.C. member of Defendant Chesapeake Operating.). Defendants execute signatory Chesapeake Exploration's Lease obligation to calculate royalties and issue royalty checks. *See* Amended Class Action Complaint, ECF No. 5 ¶¶ 6–7. The relationship between Defendants and signatory Chesapeake Exploration, as it pertains to the Leases at issue, is therefore one of agency. The gravamen of the Amended Class Action Complaint is that Defendants fraudulently underpaid royalties owed to the Royalty Owners under the Leases. *See id.* ¶ 9. This claim is inextricably intertwined with the Lease obligation of Defendants' principal, signatory Chesapeake Exploration, to correctly calculate and pay royalties. Under ordinary principles of contract and agency, Defendants are entitled to stand in the shoes of Chesapeake Exploration for purposes of compelling arbitration (and selecting arbitrators) as to

[4](...continued)
315 F.3d 619, 629 (6th Cir.2003). . . . Further, a signatory is estopped from avoiding arbitration with the nonsignatory where the nonsignatory's claims are intertwined with the underlying contract. *Id.*"); *Crossville Med. Oncology, P.C. v. Glenwood Sys., LLC*, 310 F. App'x 858, 860 (6th Cir. 2009) ("[N]onsignatories may be bound to an arbitration agreement under ordinary contract and agency principles." (quoting *Javitch,* 315 F.3d at 629)).

the Royalty Owners whose Leases contain an arbitration provision.[5] Indeed, any different finding would allow the Royalty Owners, on a mere technicality, to circumvent their commitment to arbitrate disputes arising from their Leases—a result this Circuit has cautioned against. *See* *Arnold v. Arnold Corp.-Printed Communications for Business*, 920 F.2d 1269, 1281–82 (6th Cir. 1990) ("We agree with the district court that if appellant 'can avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as [defendants] in his complaint, or signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified.' . . . We therefore will follow the well-settled principle affording agents the benefits of arbitration agreements made by their principal and affirm the district court's decision on this issue.") (citation omitted).

**C. Availability of Class Arbitration**

The Royalty Owners dispute Defendants' claim that the Federal Arbitration Act ("FAA") applies in this action, contending that Ohio law applies instead. Opposition, ECF No. 17 at PageID #: 344–49. They assert that even if Defendants can compel arbitration, under Ohio law, they cannot compel individual arbitration. *Id.* at PageID #: 354.

---

[5] The Court notes that Royalty Owners' claims are within the scope of the arbitration provisions even though they are styled as claims for conversion and violation of the Ohio RICO Act rather than as breach of contract claims. *See, e.g., Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 240–42 (1987) (holding that civil RICO claims are arbitrable under the FAA); *Health Quip, Inc. v. 8805, Inc.*, No. 1:06CV3022, 2007 WL 1452629, at *2 (N.D. Ohio May 15, 2007) (same).

**(i) Applicable Law**

"The FAA applies to '[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . .'" *Stutler v. T.K. Constructors Inc.*, 448 F.3d 343, 345 (6th Cir. 2006) (quoting 9 U.S.C. § 2). The Royalty Owners contend that the FAA's interstate commerce requirement is not met in this case. Specifically, they state,

> This case does not concern commerce. It concerns the theft and conversion of royalties sitting immobile in a bank account. . . . The result is no different if one looks beyond the bank account to the lease that generated the misappropriated royalties deposited here. This is because Chesapeake Exploration sells the gas the instant it leaves the ground, before there is even *intrastate* commerce, much less interstate commerce.

Opposition, ECF No. 17 at PageID #: 344.

The U.S. Supreme Court has addressed the scope of the FAA's interstate commerce factor:

> We have interpreted the term "involving commerce" in the FAA as the functional equivalent of the more familiar term "affecting commerce"-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power. Because the statute provides for "the enforcement of arbitration agreements within the full reach of the Commerce Clause," it is perfectly clear that the FAA encompasses a wider range of transactions than those actually "in commerce"-that is, "within the flow of interstate commerce,"
>
> . . . .
>
> . . . Congress' Commerce Clause power "may be exercised in individual cases without showing any specific effect upon interstate commerce" if in the aggregate the economic activity in question would represent "a general practice ... subject to federal control." Only that general practice need bear on interstate commerce in a substantial way.

(4:15CV02275)

*Citizens Bank v. Alafabco, Inc.* 539 U.S. 52, 56-57 (2003) (citations omitted).

A court in the Northern District of New York applied this rubric to a case concerning an oil and gas lease dispute between royalty owners and Chesapeake Appalachia, an affiliate of Defendants and Chesapeake Exploration. *Alexander v. Chesapeake Appalachia, LLC*, 839 F. Supp. 2d 544 (N.D.N.Y. 2012). Resolving the parties' disagreement as to the applicability of the FAA, the court held,

> Applying [the] guidelines [set forth in *Citizens Bank*], the leases here fall within the extent of Congress' Commerce Clause power. Although the oil and gas leases at issue involve real property only in New York, the plaintiff landowners in New York negotiated the subject leases with CAP, an Ohio company and CNR, a Delaware limited liability company. Those leases have since been acquired by Chesapeake, an Oklahoma limited liability company and Statoil, a Delaware corporation. Further, *while no drilling has yet been commenced on the properties and thus no gas has been found nor shipped in interstate commerce, the contracts clearly evidence transactions involving interstate commerce*. As defendants point out, *the leases' primary purpose is the development of gas resources which will ultimately be placed in an interstate pipeline subject to federal regulation*. . . . Accordingly, the leases satisfy the FAA's "involving commerce" test and the FAA will be applied.

*Id.* at 550 (emphasis added).

Also, resolving a dispute between royalty owners and Chesapeake Appalachia, a court in the Middle District of Pennsylvania has recently held,

> While the Lease at issue involves real property solely situated in Pennsylvania and the [royalty owners] are Pennsylvania residents, the subject Lease was negotiated with Chesapeake, an Oklahoma company. Even if the gas produced by Chesapeake is sold at the wellhead in Pennsylvania, the Lease is clearly part of a chain of transactions involving interstate commerce for it is well-established that the end use of the natural gas and oil extraction in the Marcellus Shale is not simply contained within Pennsylvania's borders. Accordingly, the Lease satisfies the FAA's "involving commerce" test and the FAA will be applied.

*Chesapeake Appalachia, L.L.C. v. Ostroski, et al.*, Case No. 4:16CV00050, Document 36 (M.D. Pa. Aug. 8, 2016). In *Ostroski*, as in the case at bar, the underlying dispute concerned the calculation of royalties.

As can be seen from *Alexander* and *Ostroski*, the analysis does not turn on the *situs* of sale and title transfer. In light of the broad scope of the FAA's interstate commerce factor, the Royalty Owners' position is untenable. The Royalty Owners in this action are residents of Ohio and Texas. *See* Amended Class Action Complaint, ECF No. 5 ¶¶ 18 –40. Each of the Royalty Owners either entered into their Lease with Chesapeake Exploration, an Oklahoma company, or their Lease was assigned to Chesapeake Exploration. *See id.*; Corporate Disclosure Statement in *Chesapeake Exploration, L.L.C., v. Henceroth, et al.*, Case No. 4:16CV00150, ECF No. 2 at PageID #: 145 (stating Chesapeake Exploration's citizenship). Of the Royalty Owners who have received royalty checks, those checks were calculated and issued by Defendants, which are Oklahoma companies. ECF No. 5 ¶¶ 6–7, 41–42. Furthermore, the Royalty Owners have conceded that the processed natural gas that is the subject of their Leases is ultimately transported "through pipes to the interstate pipeline system." *Id.* ¶¶ 58, 109, 120.

Construing these uncontested facts against the broad, inclusive scope of the FAA's interstate commerce factor, the Court finds that there is no genuine dispute of material fact that the Leases substantially affect interstate commerce for purposes of the FAA.[6]

---

[6] The Court need not find that the Leases are conveyances of real property. *See* Opposition, ECF No. 17 at PageID #: 351–52 (arguing that oil and gas leases are conveyances of real property, and therefore are not subject to the FAA). The analysis does not turn on this issue. Moreover, the argument is unsupported. The Royalty Owners (continued...)

(4:15CV02275)

**(ii) Judicial Estoppel**

The Royalty Owners contend that Defendants are judicially estopped from asserting that the FAA applies. *See* Opposition, ECF No. 17 at PageID #: 349. The Sixth Circuit has explained the concept of judicial estoppel:

> "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." . . . [I]t is well-established that at a minimum, "a party's later position must be 'clearly inconsistent' with its earlier position[]" for judicial estoppel to apply[.] Moreover, the doctrine of judicial estoppel "is applied with caution to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement."

*Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008) (citations omitted).

The Royalty Owners urge application of this principle, stating,

> [I]n neighboring Pennsylvania, three district court judges have correctly ruled that state arbitration law applies to Chesapeake's oil and gas leases.
>
> . . . .
>
> Chesapeake Exploration [(the signatory to the Leases)] cannot argue that its oil 1and gas leases evidence a transaction involving intestate commerce, having

[6](...continued) cite to an Ohio Supreme Court opinion resolving a quiet title action, wherein the Court explains that minerals (such as oil and gas) that underlie the surface of land are realty, *see id.* at PageID #: 351 (citing *Chesapeake Exploration, L.L.C. v. Buell*, 144 Ohio St.3d 490, 45 N.E.3d 185 (2015)). The Amended Class Action Complaint, however, makes no mention of mineral rights; only royalty interests are in dispute. *See* ECF No. 5 at PageID #: 78 –80. And, the Ohio Court of Appeals has unequivocally stated, "A royalty interest is personal property." *Pollock v. Mooney*, No. 13 MO 9, 2014 WL 4976073, at *2 ¶ 16 (Ohio Ct. App. Sept. 30, 2014).

> argued the exact opposite in *Riggs*, *New Hope*, *Ulmer*, *Hayes* and *Stiles*. Since Chesapeake Exploration cannot make that argument, Defendants cannot either. Judicial estoppel applies to privies.

ECF No. 17 at PageID #: 346, 349.

Defendants rebut the Royalty Owners' argument, asserting,

> [I]n both this case and in all the cases cited by [Royalty Owners]—*Riggs*, *New Hope*, *Ulmer*, *Hayes*, *Eisenberger*, and *Stiles* . . .Chesapeake's core position has always been that arbitration should be compelled. . . .
>
> In the *Riggs* and *New Hope* cases cited by [Royalty Owners], the parties concurred that Ohio law applied to those specific cases based on those specific facts. There was no litigated issue as to whether the FAA or Ohio law should apply, and the court was never asked to rule on the issue. Similarly, in the *Ulmer*, *Hayes*, *Eisenberger*, and *Stiles* cases cited by Plaintiffs, the parties again ***concurred*** that the Pennsylvania Arbitration Act applied in those specific cases based on those specific facts. . . . Again, there was no litigated issue as to whether the FAA or Pennsylvania law should apply.

Reply, ECF No. 20 at PageID #: 565.

The Royalty Owners have not shown that the applicability of the FAA was actually litigated in the cases they cite. *See Thompson v. Davidson Transit Org.*, 563 F. Supp. 2d 820, 830 (M.D. Tenn. 2008) ("[T]he defendant has cited no case, and the court has found none, where judicial estoppel was applied even though the parties did not litigate the allegedly inconsistent position in the prior proceeding. . . . In fact, the Sixth Circuit seems to require that the 'first court has adopted the position *urged by the party* . . . .'") (citation omitted). Nor have they shown that that the application of state law in those cases effected a different outcome than would have resulted under application of the FAA. *Lorrilard Tobacco Co.*, 546 F.3d at 757 (noting that, for judicial estoppel to apply, "a party's later position must be 'clearly inconsistent' with its earlier position") (citation omitted). And, as explained below, the Royalty Owners cannot demonstrate

that they would reap a different result under application of Ohio arbitration law. For these reasons, the Court declines to apply the principle of judicial estoppel.

The FAA applies to the arbitration provisions of the Leases.

**(iii) Availability of Class Arbitration under the FAA**

Decidedly, under the FAA, when an arbitration provision is silent as to the availability of class arbitration, a court may not impose it. *See* *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 687 (2010) ("We think that the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings."); *Reed Elsevier, Inc. ex rel. LexisNexis Div. v. Crockett*, 734 F.3d 594, 599-600 (6th Cir. 2013) ("The principal reason to conclude that this arbitration clause does not authorize classwide arbitration is that the clause nowhere mentions it. . . . [T]he absence of a class-action right does not render an arbitration agreement unenforceable."); *Huffman v. Hilltop Cos., LLC*, 747 F.3d 391, 398-99 (6th Cir. 2014) ("As was also the case in *Reed Elsevier*, here the parties' arbitration clause nowhere mentions classwide arbitration. We therefore conclude that the arbitration clause does not authorize classwide arbitration, and hold that the plaintiffs must proceed individually.") (citation omitted).

The Royalty Owners concede that the arbitration provisions in this case are silent as to class arbitration. *See, e.g.*, Opposition, ECF No. 17 at PageID #: 354 ("The fact that the arbitration provisions in the leases in this case are silent as to class arbitration does not prevent

the claims in this action from proceeding on a class basis . . . ."). Therefore, applying the FAA, the Court finds that the arbitration clauses in the Leases do not authorize classwide arbitration.

**(iv) Availability of Class Arbitration under Ohio Law**

Even if the Court were to find that Ohio arbitration law applies instead of the FAA, it does not appear that the outcome would be any different. While the Royalty Owners insist that "Ohio recognizes class arbitration even [if] the contract is silent as to class arbitration," Opposition, ECF No. 17 at PageID #: 354, Ohio appellate courts have not directly addressed the issue. As such, this Court is tasked with forecasting how the Ohio courts would rule. *See* *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001) ("If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data.").

Asserting that Ohio courts would mandate class arbitration in the face of silence, the Royalty Owners cite to two Ohio Court of Appeals decisions, wherein the court found class arbitration waivers to be unconscionable. *See* Opposition, ECF No. 17 at PageID #: 355 (citing *Eagle v. Fred Martin Co.*, 809 N.E.2d 1161 (Ohio Ct. App. 2004), and *Rude v. NUCO Educ. Corp.*, No. 25549, 2011 -Ohio- 6789, 2011 WL 6931516 (Ohio Ct. App. Dec. 30, 2011)). The Royalty Owners reason, if "a case may proceed as a class arbitration even when the contract attempts to preclude class arbitration," it may certainly do so when the contract is silent as to class arbitration. *Id.* at PageID #: 354–55.

The Royalty Owners' argument is unavailing. In the cases they cite, the Ohio Court of Appeals found the class arbitration waivers unconscionable based on the particular circumstances

of each case. *See, e.g.*, *Eagle*, 809 N.E.2d at 169 ¶ 45 (noting that "in consumer transactions, and especially those involving necessities such as automobiles . . . closer scrutiny is necessary for the preservation of the protections afforded consumers through legislation such as the [Consumer Sales Practices Act]); *Rude*, 2011 WL 6931516 at *4 ¶ 12 (noting that the arbitration provision was embedded in a contract of adhesion that evidenced a consumer transaction for the provision of educational services). Those facts are not sufficiently analogous to the facts that underlie this action. Additionally, in the case at bar, the question before the Court does not concern explicit class arbitration waivers or unconscionability. The question is whether a party to a contract can be forced to arbitrate on a class basis when the arbitration provision does not address the issue at all.

The Royalty Owners' position also does not reflect the current trend of the Ohio Court of Appeals. In more recent cases than *Eagle* and *Rude*, the Ohio Court of Appeals adopted the Sixth Circuit's position on a closely related question of class arbitration—whether a court or an arbitrator decides whether class arbitration is available. *See*, *e.g.*, *Bachrach v. Cornwell Quality Tools Co., Inc.*, No. 27113, 2014 WL 7454687, at *4 ¶¶ 13-14 (Ohio Ct. App. Dec. 31, 2014); *Shakoor, et al. v. VXI Global Solutions, Inc.*, No. 14 MA 59, 35 N.E.3d 539, 546–47 ¶¶ 34–36 (Ohio Ct. App. June 16, 2015).

In *Bachrach*, the Ohio Court of Appeals held,

> After a review of the relevant case law, we are persuaded by the rationale of the Sixth Circuit as stated in *Reed Elsevier, Inc.* While not directly addressing the issue presented here, the United States Supreme Court, "characterized the differences between bilateral and classwide arbitration as 'fundamental.'" *Id.* at 598, quoting *Stolt–Nielsen*, 559 U.S. at 686. Because the issue of whether the dispute may be arbitrated as a class is "fundamental to the manner in which the parties will resolve

> their dispute," the issue is more aligned with a threshold matter and must be decided by the court, absent an agreement to the contrary. *Id.* at 598–599.

2014 WL 7454687, at *4 ¶¶ 13–14.

The Court maintained this position in *Shakoor*, holding,

> The Sixth Circuit has clearly stated that [class arbitration] is a gateway issue and provided two reasons for such conclusion. First, it cited the language in *Stolt–Nielsen*, that it cannot be presumed that the parties consented to class arbitration simply by agreeing to submit their dispute to an arbitrator. [*Reed Elsevier, Inc.*], 734 F.3d at 598. Second, it referenced the differences between bilateral and class arbitration that were discussed in *Stolt–Nielsen*. *Id.* The court concluded that the question of whether the parties agreed to class arbitration is "vastly more consequential than even the gateway question of whether they agreed to arbitrate bilaterally." *Id.* at 599. It then reasoned that "[a]n incorrect answer in favor of classwide arbitration would 'forc[e] parties to arbitrate' not merely a single 'matter that they may well not have agreed to arbitrate[,]' but thousands of them." *Id.*
>
> . . . .
>
> . . . Considering all the above, we are in agreement with our sister district's decision in *Bachrach* which adopted the Federal Sixth Circuit Court of Appeal's decision in [*Reed Elsevier, Inc.*] that class arbitration is an issue for the judiciary, unless the agreement specifies otherwise.

35 N.E.3d at 546–47 ¶¶ 34–36.

In *Bachrach* and *Shakoor*, the Ohio Court of Appeals cited the U.S. Supreme Court's and Sixth Circuit's recognition of the fundamental differences between bilateral and class-wide arbitration. Aligning with that perspective, the Ohio Court of Appeals agreed that when an arbitration provision is silent as to who decides whether class arbitration is available, that determination must be left to the judiciary. Considering the analysis set forth by the Ohio Court of Appeals in resolving that related question, the Court is persuaded that Ohio courts would also

agree that the differences between class and bilateral arbitration are too great to require class arbitration when an arbitration provision is silent on the issue.

Accordingly, the Court finds that whether the FAA or Ohio law applies, the same result is reached: Defendants may compel individual arbitration.

## III. Motion to Stay

Defendants move the Court to stay the case as to the Royalty Owners whose Leases include an arbitration provision, arguing that the FAA requires it. Brief in Support, ECF No. 15-1 at PageID #: 177. They also move the Court to temporarily stay the case as to all remaining Royalty Owners, for purposes of judicial economy and efficiency, until the Court resolves the Motion for Summary Judgment at ECF No. 17 in *Chesapeake Exploration, L.L.C. v. Henceroth, et al.*, Case No. 4:16CV00150 (N.D. Ohio); and the Motion to Dismiss at ECF No. 9 in *Henceroth, et al. v. Chesapeake Exploration, LLC*, Case No. 4:15CV02591 (N.D. Ohio). *Id.* at PageID #: 177–80. The Royalty Owners urge that the Court should not stay the case as to the ten Royalty Owners whose Leases do not include arbitration provisions, asserting that their claims do not affect and are not affected by the related litigation. *See* Opposition, ECF No. 17 at PageID #: 356.

Upon a party's request, the Court is required to stay any action that it finds is referable to arbitration under the FAA. *See* 9 U.S.C. § 3 ("[T]he court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .") (emphasis added);

*Arthur Anderson LLP v. Carlisle*, 556 U.S. 624, 625 (2009) ("Section 3 of the [FAA] *entitles* litigants in federal court to a stay of any action that is 'referable to arbitration under an agreement in writing.' . . . a litigant who was not a party to the relevant arbitration agreement may invoke § 3 if the relevant state contract law allows him to enforce the agreement.") (emphasis added). In accordance with its findings herein, the Court grants Defendants' motion to stay the case as to the Royalty Owners whose Leases include an arbitration provision.

The Court also has inherent authority to stay cases. *See F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 626–27 (6th Cir. 2014) (quoting *Ohio Envtl. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir.1977)) ("'The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants, and the entry of such an order ordinarily rests with the sound discretion of the District Court.'"). The facts, parties, and counsel in this litigation and the related litigation significantly overlap. The Court is not persuaded that the disposition of the related litigation does not affect the claims of the Royalty Owners in this case. The Court, therefore, exercises its discretion to stay the case as to the Royalty Owners whose Leases do not contain arbitration provisions.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion to Compel Individual Arbitration and Motion to Stay, ECF No. 15, are granted.

IT IS SO ORDERED.

September 29, 2016
Date

*/s/ Benita Y. Pearson*
Benita Y. Pearson
United States District Judge